IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

SHAMARR PITTS,

          Defendant.

CRIMINAL ACTION
NO. 13-403-1

## OPINION

**Slomsky, J.**                                                     **February 12, 2015**

### CONTENTS

I.     INTRODUCTION ................................................................................................. 3

II.    FACTUAL FINDINGS ........................................................................................ 4

   A.  Defendant's Arrest at 43 Schappet Terrace ...................................................... 4

   B.  Defendant's Interrogation and Booking ...........................................................11

   C.  Detective Smith's Contact with the Confidential Informant ............................. 12

III.   ANALYSIS ........................................................................................................ 13

   A.  Entry into 43 Schappet Terrace Was Lawful Because the Police,

       Armed with an Arrest Warrant, Had Probable Cause to Believe That

       Defendant Was Inside and Had a Significant Relationship to the Premises ...................... 13

   B.  Defendant's Statement to the Police on June 5, 2013 Is Admissible

       at Trial Because Federal Rule of Criminal Procedure 5 Was Not Violated ....................... 19

   C.  The Identity of the Confidential Informant Will Not Be Disclosed

       to Defendant ................................................................................................. 25

1.   Government's Memoranda of Law and Detective Smith's suppression hearing testimony ................................................................................ 31

2.   Law enforcement testimony regarding the timing of the informant's information and the "BOLO" advisory ............................................... 32

3.   Nondisclosure of information about the confidential informant ........................... 33

IV.   CONCLUSION ................................................................................................ 37

## I.    INTRODUCTION

Before the Court are several pretrial motions filed by Defendant Shamarr Pitts in which he seeks the suppression of certain evidence and the disclosure of the identity of a confidential witness who supplied the police with information on a location he frequents.[1]

In Count One of the Indictment, Defendant is charged with assaulting a federal law enforcement officer in violation of 18 U.S.C. §§ 111(a)(1) and (b); in Count Two with possessing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1); and in Count Three with possessing a firearm while he was a convicted felon in violation of 18 U.S.C. § 922(g)(1).  The charges stem from a June 4, 2013 encounter with local police and federal law enforcement during the execution of arrest warrants for Defendant at 43 Schappet Terrace, Lansdowne, Delaware County, Pennsylvania.  (Doc. No. 1.)

In the Motions to Suppress Physical Evidence and Observations and Statements, Defendant moves to suppress a .22 caliber Phoenix Arms semi-automatic handgun, ammunition, and a magazine seized by the police pursuant to a search warrant after the arrest of Defendant at 43 Schappet Terrace.  (Doc. No. 24.)  Defendant also moves to suppress any observations made by law enforcement after entry into 43 Schappet Terrace, and his subsequent statement to police

---

[1] The motions are Defendant's Motion to Suppress Physical Evidence and Observations (Doc. No. 24), Defendant's Supplement to Motion to Suppress Physical Evidence, Observations, and Statements (Doc. No. 33), and Defendant's Motion and Supplemental Memoranda for Disclosure of the Identity of a Material Witness (Doc. Nos. 32, 46, 52, 57.)  The Government filed Responses in Opposition to Defendant's Motions (Doc. Nos. 25, 36, 49, 56.)  The "material witness" that Defendant seeks the identity of is described by the Government as a "confidential informant."  The Government opposes the disclosure of the identity of the informant.

On January 29, 2015, the Court entered an Order denying the Motions, noting that an Opinion with findings of fact and legal conclusions would be forthcoming.  (Doc. No. 64.)  Trial was held from January 29 to February 2, 2015.  Defendant was convicted by a jury on the three counts.  This Opinion follows.

after he was arrested at 43 Schappet Terrace and taken into custody.  (Doc. Nos. 24, 33.)

Defendant claims that the items seized, police observations, and his subsequent statement should

be suppressed as fruits of an illegal entry by local police and federal agents into 43 Schappet

Terrace in violation of his Fourth Amendment rights.  (Doc. Nos. 24, 33.)  Defendant also moves

to suppress his statement made to state law enforcement officers hours after his arrest because he

contends the authorities violated the requirements of Federal Rule of Criminal Procedure 5,

which requires that a defendant be arraigned before a magistrate judge without unreasonable

delay after arrest.  (Doc. Nos. 33, 52.)  In addition, Defendant moves for the disclosure of the

"material witness" who provided law enforcement with information that he frequented the

residence at 43 Schappet Terrace.  (Doc. No. 32 ¶ 4.)

The Government filed Responses in Opposition to Defendant's Motions.  (Doc. Nos. 25,

36, 49, 56.)  Hearings were held on the Motions on September 4, November 18, and December

15, 2014.  (Doc Nos. 31, 45, 51.)  The parties disagree on whether 43 Schappet Terrace was

entered illegally, whether obtaining the statement violated Federal Rule of Criminal Procedure 5,

and whether the identification of the confidential informant should be disclosed.  For reasons that

follow, the Court finds that the entry into 43 Schappet Terrace was lawful and any evidence

obtained after that entry is admissible at trial, and that Federal Rule of Criminal Procedure 5 was

not violated.  Finally, Defendant's Motion for the disclosure of the identity of the confidential

informant (Doc. No. 32) will be denied.

## II.    FACTUAL FINDINGS

### A.    Defendant's Arrest at 43 Schappet Terrace

On May 25, 2013, Philadelphia police officers obtained an arrest warrant for Defendant

for his involvement in a May 13, 2013 shooting at the Purple Orchid, a club in West

Philadelphia. (Gov. Ex. 4; Doc. No. 51 at 132-33.)  The warrant was sent to Detective Patrick

Smith of the Philadelphia Police Department.  Detective Smith is assigned to a Federal Bureau of

Investigation (FBI) Violent Crimes Task Force, which assists local police in apprehending

individuals charged with violent crimes.[2]  From video footage released to the media and various

tips, the police learned that Defendant drove at the time of the Purple Orchid Shooting a silver

Pontiac Bonneville registered to Defendant's girlfriend, Evonne Hodges.  (Gov. Ex. 4.)  They

also learned that Hodges resided at 30 Branford Road, Darby, Pennsylvania, and that Defendant

frequented that same address.  (Id.)

On May 24, 2013, the day before the arrest warrant was issued for Defendant, Darby

Borough police officers, using a SWAT team, executed a search warrant at 30 Branford Road.

(Gov. Exs. 2, 3.)  Evonne Hodges, who owned the residence at 30 Branford Road, was the only

adult present during the ensuing search.  (See Doc. No. 51 at 24; Doc. No. 45 at 79.)  When

questioned by the officers, Hodges at first denied owning a silver Pontiac Bonneville and

knowing Defendant.  (Doc. No. 51 at 25, 136.)  During the search, police found a pink slip for

the silver Pontiac Bonneville in her name, a parking ticket for the vehicle, and other paperwork

for the vehicle.  (Gov. Ex. 2; Doc. No. 45 at 81; Doc. No. 51 at 27.)  Police also found mail

addressed to Defendant and Defendant's wallet under a mattress.  (See Doc. No. 51 at 28; Gov.

Ex. 2.)  The wallet contained his personal identification card and other documents in his name.

(Doc. No. 51 at 28; Gov. Ex. 2.)  Finally, police recovered a stolen Taurus .38 special revolver,

---

[2]  The FBI Violent Crimes Task Force is a unit comprised of federal agents and Philadelphia
police officers which investigates and seeks to apprehend fugitives and individuals involved in
bank robberies and crimes against persons.  (Doc. No. 51 at 129-30.)  The Task Force operates
primarily in Philadelphia and the majority of the warrants they act upon are obtained by the
Philadelphia Police Department.  (Id.)  The Task Force will cross county lines when necessary.
(Id.)  One purpose of the Task Force is to provide resources that local municipalities do not
otherwise have.  (Id.)

an empty Phoenix Arms .22 caliber gun box registered to Hodges, and various illegal drugs. (Doc. No. 45 at 79-81; Doc. No. 51 at 26-30, 32; Gov. Ex. 2.)

During the search, Hodges eventually admitted knowing Defendant, and stated that the silver Pontiac Bonneville associated with the Purple Orchid shooting was her car and that Defendant had use of the vehicle for two weeks. (Gov. Ex. 4; Doc. No. 51 at 135.) Hodges also stated that the shooter entering the Purple Orchid seen in the video was an individual named Henry Pettigrew and that the other male entering the club alongside Pettigrew was Defendant. (Doc. No. 51 at 135-36.) Hodges was then arrested for illegal possession of a firearm and for a controlled substance offense. (Id. at 25, 135.) Darby police also obtained an arrest warrant for Defendant based on the items recovered during the search. (Doc. No. 45 at 79-81.) At this point, two state arrest warrants for Defendant were outstanding.

Acting on information from the 30 Branford Road search, Detective Smith developed a confidential informant in early June 2013 who provided additional intelligence about Defendant. (Doc. No. 51 at 134, 137.) The informant told Smith that Defendant frequented the residence at 43 Schappet Terrace in Lansdowne Borough, a section of Delaware County, Pennsylvania. (Id.) The informant also told Detective Smith that the silver Pontiac Bonneville was the Defendant's only mode of transportation. (Id.) Based on this information, Philadelphia police sent a "BOLO" ("be on the lookout") to Darby Borough police for the silver Pontiac Bonneville and the Defendant at 43 Schappet Terrace. (Id. at 138-39, 164, 169.)[3]

---

[3] Suppression hearing testimony on the subject of the "BOLO" varied. As noted, Detective Smith testified on direct examination that he informed Delaware County police departments about the information from the confidential informant that Defendant frequented 43 Schappet Terrace. (Doc. No. 51 at 138-39.) On cross-examination, Detective Smith said that he provided the information from the confidential informant regarding 43 Schappet Terrace and the silver Pontiac Bonneville to Lieutenant Richard Gibney of the Darby Borough Police Department days before Defendant's arrest, who in turn put out the "BOLO" to Delaware

On June 4, 2013, Officer Mark Hudson, a patrolman with the Darby Borough Police Department, located the silver Pontiac Bonneville parked in front of 43 Schappet Terrace.[4] (Doc. No. 45 at 41, 46, 53.) Officer Hudson recognized the Pontiac as matching the description of the vehicle related to the shooting at the Purple Orchid. (Id. at 40, 42.) He ran the vehicle's license tag through his computer system, and verified that it was the vehicle associated with the shooting. (Id.) Officer Hudson called his supervisor and Officer Jonathan McGowan of the Lansdowne Police Department and gave them this information. (Id.)

In response to Officer Hudson's call, Officer McGowan and two Lansdowne police officers went to the intersection of Nyack Avenue and Schappet Terrace at 10:33 a.m. (Id. at 64.) While at that location, Officer McGowan observed the silver Pontiac Bonneville parked directly in front of 43 Schappet Terrace. (Id. at 54, 57.) The officers then posted themselves in a perimeter around the residence. (Id. at 58, 61.)

In addition, Darby Borough Lieutenant Richard Gibney, after learning that the silver Pontiac Bonneville was found parked in front of 43 Schappet Terrace, notified Philadelphia

---

County police departments. (Id. at 164-66.) Gibney was not asked and did not testify that he sent the "BOLO." (Doc. No. 45 at 84.) Rather, Gibney testified that after hearing that the Pontiac Bonneville was parked on Schappet Terrace, he contacted Smith who in turn said, "I just developed information that that's the address he [Defendant] is in." (Id.) On cross-examination, Gibney testified that he did not have any information linking Defendant to 43 Schappet Terrace until he spoke to Smith on June 4, 2013 while Gibney was traveling to that location. (Doc. No. 51 at 10.) Darby and Lansdowne officers testified that they had been notified to be on the lookout for a car Defendant may be driving. (Doc. No. 45 at 40, 46-47, 61, 64.) The officers were not asked if they were aware of Defendant's connection to 43 Schappet Terrace. (Id.) Despite the discrepancy on the timing of when the information was conveyed, the fact remains that Defendant was tied to 43 Schappet Terrace and the silver Pontiac Bonneville through information provided by the confidential informant and personal observations of the officers and lieutenant.

[4] The property at 43 Schappet Terrance is a two-story twin residence with a front porch. It is located near the entrance to a short dead-end street that terminates at a fence blocking access to SEPTA railroad tracks. (Doc. No. 25 at 6.)

Police Detective Smith that the car was spotted at 43 Schappet Terrace.  (Doc. No. 45 at 84.) Smith informed Gibney that he had received information linking Defendant to that address, and that Task Force officers would meet Gibney at 43 Schappet Terrace.  (Id.)  Lieutenant Gibney and Darby Borough Detective Brian Pitts[5] drove to 43 Schappet Terrace, observed the silver Pontiac Bonneville parked directly in front of the residence, and waited for members of the FBI Task Force to arrive.  (Doc No. 51 at 33-35.)

At approximately 11:30 a.m., members of the Task Force and other law enforcement officers arrived at 43 Schappet Terrace.  (Doc. No. 51 at 35, 140.)  At that time, Detective Smith, FBI Agent James Tarasca, and Lieutenant Gibney knocked and announced their presence at the front door of the residence for three to five minutes, stating that they were police and had an arrest warrant.  (Doc. No. 51 at 39, 141; Doc. No. 45 at 85.)

During the knock and announce, Detective Pitts stationed himself in front of the residence to the left hand side of the front door steps where he could observe the second floor windows.  (Doc. No. 51 at 35-56.)  Detective Pitts observed someone look out of the second floor front bedroom window.  He informed the officers knocking at the front door that someone was located on the second floor.  (Doc. No 51 at 36; Doc. No. 45 at 85.)[6]

Receiving no answer at the front door, Gibney and Tarasca moved around the perimeter of the residence and similarly knocked and announced their presence at the back door.  (Doc. No. 45 at 85.)  The door was forced open and the two men entered the home through the kitchen area.

---

[5]  Detective Pitts is not related to Defendant Shamarr Pitts.  (Doc. No. 45 at 78.)

[6]  Detective Smith testified that Detective Pitts "screamed that a black male came to the front window, the second-floor front window."  (Doc. No. 51 at 141.)  In his testimony, Detective Pitts stated that he could not tell the race or sex of the person he viewed in the second floor window.  (Id. at 38.)

(Id.)  They then went to the front door, where Smith entered the residence.  (Doc. No. 51 at 171.)

Once inside, a protective sweep of the first floor and the basement took place to ensure that no

other person was present on those floors.  (Doc. No. 45 at 85-86.)

Thereafter, armed with handguns, Smith led Gibney and Tarasca up the stairs to the

midpoint between the first and second floors.  (Doc. No. 51 at 142.)  Smith then testified as

follows:

> I get up to the steps, and I can see the rear bedroom door was ajar and a bathroom
> adjacent to the bedroom was ajar.  So I could see into those rooms.  And not
> visibly seeing anybody, I concentrated primarily on the front room because the
> door itself was flushly closed.

(Id. at 142-43.)

Smith put his handgun in his left hand, reached his right arm through the bannister,

announced his presence again, and pushed open partially the door to the front bedroom.  The

door would not completely open.  (Id.)  Smith again announced his presence and succeeded

pushing the door open with his right hand.  (Id.)  When the door opened, Smith testified:

> Mr. Pitts was standing over the top of me with a gun in his hand, racking[7] the gun
> and pulling the trigger.  And it was directly pointed at my head.  At that point in
> time, I screamed gun, and I transcended [sic] back down the steps.

(Id. at 144.)

During Detective Smith's encounter with Defendant, Lieutenant Gibney also heard the

sound of a gun racking.  (Doc. No. 45 at 87.)  He too observed Defendant in the room, but was

unsure whether Defendant wielded a gun.  (Doc. No. 51 at 11.)  Agent Tarasca and Lieutenant

Gibney retreated to the first floor with Detective Smith and then ordered Defendant to surrender.

(Id. at 144-45.)  After about two minutes of exchanging words with Smith, Defendant

---

[7] The affidavit of probable cause for the search warrant issued for 43 Schappet Terrace indicates
that "racking" means that "someone was loading a weapon to fire."  (Gov. Ex. 9.)

surrendered and was taken into custody by the Darby Borough police on the two outstanding warrants. (Doc. No. 45 at 88, 90; Doc. No. 51 at 145-47.)

After the arrest, Detective Smith returned to work at the Federal Building at Sixth and Arch streets in Philadelphia and was not involved with Defendant's booking or subsequent interrogation. (Doc. No. 51 at 147.) Smith testified that the Defendant's arrest concluded the Violent Crimes Task Force's involvement in the case: "my investigation was to locate and apprehend Shamarr Pitts. I didn't have any instrumental part in the investigation or the arrest warrants, affidavit of probable cause." (Id. at 148.)

After Defendant was placed into custody, Lansdowne Borough Sergeant James McCaughn interviewed Detective Smith for the purpose of preparing a search warrant for 43 Schappet Terrace. (Doc. No. 51 at 120-23.) The search warrant was issued and the search commenced. (Doc. No. 45 at 91; Doc. No. 51 at 89-91.) During the search of the front bedroom where Defendant was seen, police found a .22 caliber Phoenix Arms semi-automatic handgun with a round still in the chamber, two live .22 caliber rounds of ammunition on the floor, and an expended round at the base of the front bedroom door. (Gov. Ex. 10; Doc. No. 51 at 67, 97-98, 106.) The .22 caliber Phoenix Arms was registered to Evonne Hodges and came from the empty firearm box registered in her name that was found during the search of 30 Branford Road. (Doc. No. 45 at 82; Doc. No. 51 at 67-68.) Officers recovered a "banana clip" for an AK-47 assault rifle, loaded with fourteen live rounds, hidden between the box spring and mattress of a bed in the front bedroom. (Doc. No. 51 at 45-46; Gov. Ex. 2.) Police also found on the windowsill Defendant's wallet with his identification card, and mail to "Keem G$" from Defendant inserted into a black composition notebook on a dresser in the front bedroom. (Gov. Exs. 10, 11-12, 11-13, 11-17; Doc. No. 51 at 103.) Additionally, police found in a closet located in a different

bedroom keys to the silver Pontiac Bonneville.  (Doc. No. 51 at 46-47, 102; Gov. Exs. 10, 11-12, 11-31.)

### B.       Defendant's Interrogation and Booking

Defendant was arrested after 11:30 a.m.  (See Gov. Ex. 9.)  He was taken to the Darby Borough Police Department.  There, he was interviewed by two Philadelphia police detectives. (Doc. No. 51 at 48; Doc. No. 45 at 90.)  Defendant gave a statement regarding his knowledge of and involvement in the shooting at the Purple Orchid, the search of 30 Branford Road, and his arrest at 43 Schappet Terrace.  (Def. Ex. 6.)  The statement indicates that it was taken at 5:30 p.m. and concluded at 7:50 p.m.  (Id.)  The next day, June 5th at 12:00 p.m., Defendant was brought before Magistrate Judge Leonard Tenaglia, a state District Justice for arraignment on the two state charges.  (Def. Ex. 2; Doc. No. 51 at 48, 146-47.)

Testimony was elicited at the suppression hearing that after someone is taken into custody, the standard procedure in Darby Borough is to take the suspect in front of a magistrate judge for arraignment on the same day as the arrest if the judge is available, or normally, the next day, if the judge is not available.  (Doc. No. 51 at 70.)  There is normally an on-call judge who sits at nighttime, but the judge is only there for a short amount of time.  (Id.)  If the assigned officers have not completed initial paperwork, they would hold the person being detained and would bring him for arraignment the next day.  (Id.)  The time that the magistrate judge would arraign a detainee varies based on the judge's schedule for that day.  (Id. at 71.)  One magistrate judge works in Darby Borough, and the judge's chambers is next door to the Darby Borough Police Station.  (Id.)  In the instant case, no attempts were made to contact the on-call magistrate judge.  However, there was no testimony as to whether a magistrate judge was in fact available on June 4, 2013.  (See id. at 70-71, 74.)

### C.      Detective Smith's Contact with the Confidential Informant

As mentioned above, Detective Smith received information from a confidential informant about Defendant driving the silver Pontiac Bonneville and frequenting 43 Schappet Terrace. Detective Smith testified at the suppression hearing that he first came into contact with the confidential informant when the Violent Crimes Task Force went to 30 Branford Road in an attempt to apprehend Defendant.  (Doc. No. 51 at 152.)[8]  Smith testified that he met with the informant in person three times, and that they spoke on the phone three to four times.  (Id. at 149.)  Lieutenant Gibney was present during two of the three in-person meetings.[9]  (Id. at 149-51.)

Smith described the majority of the information provided by the informant as "vague." (Doc. No. 51 at 153.)  The informant told him that Defendant was driving the silver Pontiac Bonneville, and provided its license tag number, and numerous locations where Defendant possibly could be found, including 30 Branford Road and 43 Schappet Terrace.  (Id. at 148.)  At least twice, the informant contacted Smith to inform him that Defendant would be present at 30 Branford Road.  (Id. at 153-54.)  The tips on the location of Defendant did not pan out except for 43 Schappet Terrace on June 4, 2013.  (Id.)

Gibney was not present when the informant provided Smith with information regarding 43 Schappet Terrace.  (Id. at 151.)  This information was provided to Smith during one of the phone calls with the source.  (Id.)  The source did not provide specific information about how he or she knew that 43 Schappet Terrace could be a place where Defendant frequented, or any

---

[8] It is unclear exactly when Smith first met with the confidential informant.  It appears that it was between the May 24, 2013 search of 30 Branford Road and before June 4, 2013, when Defendant was arrested.

[9] Gibney was not asked at the suppression hearing whether he was present during the meetings. (See Doc. No. 45 at 76-94.)

specifics regarding when the source was last in Defendant's company at 43 Schappet Terrace.

(Id. at 153.)

As of December 15, 2014, Smith was unaware of any threats made against the informant.

(Id. at 154.)  The informant was paid $500 for the information provided.  (Def. Ex. 3; Id. at 157.)

## III.   ANALYSIS

### A.   Entry into 43 Schappet Terrace Was Lawful Because the Police, Armed with an Arrest Warrant, Had Probable Cause to Believe That Defendant Was Inside and Had a Significant Relationship to the Premises

Defendant contends that the police entry into 43 Schappet Terrace was unlawful because

law enforcement did not possess reason to believe that Defendant resided at 43 Schappet Terrace

and was inside the residence at the time of the entry.  On the other hand, the Government submits

that the entry by Violent Crimes Task Force agents and local officers was supported by sufficient

facts and circumstances to establish that there was probable cause that Defendant resided in and

was present at 43 Schappet Terrace during execution of the arrest warrant.[10]

The Fourth Amendment "prohibits the police from making a warrantless and

nonconsensual entry into a suspect's home in order to make a routine felony arrest."  Payton v.

New York, 445 U.S. 573, 576 (1980).  However, "an arrest warrant founded on probable cause

---

[10]  As noted previously, police obtained a search warrant for 43 Schappet Terrace.  (Gov. Ex. 9.) Pursuant to the search warrant, police seized a .22 caliber Phoenix Arms handgun loaded with five rounds of ammunition and one round in the chamber, (Doc. No. 51 at 106), two rounds of ammunition from a .22 caliber handgun from the floor of the second floor front bedroom, an expended round at the base of the bedroom door, a "banana clip" belonging to an AK-47 rifle in between a mattress and box spring in a second floor bedroom, Defendant's wallet on the windowsill, a black composition notebook with mail addressed from Defendant, and keys to the Pontiac Bonneville.  (Gov. Ex. 10.)  These items of evidence are the fruits of the lawful entry and seizures pursuant to a search warrant and were admissible at trial.

implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe* the suspect is within." Id. at 602 (emphasis added).[11]

Under Payton, before entering a residence, police officers must have "a reasonable belief that the arrestee (1) lived in the residence, and (2) is within the residence at the time of entry." United States v. Veal, 453 F.3d 164, 167 (3d Cir. 2006) (quoting United States v. Gay, 240 F.3d 1222, 1226 (10th Cir. 2001)). For purpose of determining whether a suspect "lived" at a location, the suspect "need not actually live in the [specified] residence, so long as he possesses common authority over, or some other significant relationship to the residence entered by police." Id. at 168 n.6 (quoting Gay, 240 F.3d at 1226).[12]

---

[11] Defendant cites Steagald v. United States, 451 U.S. 204, 222 (1981) for the proposition that "[t]he obligation to obtain a search warrant remains even when law enforcement possess an arrest warrant for an individual in a house." (Doc. No. 52 at 13.) This argument is misplaced because Steagald "only protects 'the interests of the third-party owner of the residence,' not the suspect himself, 'regardless of whether the suspect has a reasonable expectation of privacy in the home.'" Veal, 453 F.3d at 167 n.5 (quoting United States v. Agnew, 407 F.3d 193, 196-97 (3d Cir. 2005)).

[12] In this case, it may be irrelevant whether Pitts lived at 43 Schappet Terrace because if he did not live at 43 Schappet Terrace, he would have no privacy interest there. As the Third Circuit observed in United States v. Agnew:

> [W]hether the home was [defendant's] residence was ultimately irrelevant because under any possible alternatives the entry pursuant to the arrest warrant did not violate [defendant's] Fourth Amendment rights. If [defendant] resided at [the home], his arrest was lawful under Payton because the police acted pursuant to an arrest warrant. If [defendant] did not reside at [the home], he may have lacked a privacy interest in the residence and would have no standing to challenge the police officer's entry.

407 F.3d at 196 (citing Minnesota v. Olson, 495 U.S. 91, 95-97 (1990) (citations omitted)).

Here, the Government did not challenge Defendant's standing to suppress the evidence seized at 43 Schappet Terrace. They did refer to standing in a footnote in a memorandum of law (Doc. No. 56 at 5 n.1), but did not pursue the standing issue with evidence at the hearings on the Motions.

Third Circuit precedent remains unsettled as to what standard should be applied to Payton's reference to whether a suspect "lived" in the residence and if there was "reason to believe" the suspect was present in the home.  In Agnew, a 1990 decision, the Third Circuit equated "reason to believe" with probable cause.  407 F.3d at 196-97.  However, in Veal, decided in 2006, the Third Circuit recognized that most courts have interpreted "reason to believe" as encompassing a less stringent standard than probable cause and more akin to reasonable belief. 453 F.3d at 167 n.3.  The court in Veal refrained from deciding the issue because it found that the probable cause standard had been met in that case.  Id.  More recently, the Third Circuit noted in United States v. Porter that:

> The Court in Agnew cited Payton as requiring a showing of probable cause before police may enter a dwelling in which a suspect is believed to be located.  Agnew, 407 F.3d at 196.  However, the express language of the Supreme Court in Payton was that there need only be a "reason to believe" that the suspect is within. Payton, 445 U.S. at 603.  Obviously, this Court cannot change what the Supreme Court said and the Court in Agnew gave no explanation for citing Payton as requiring probable cause.  We believe the reference to Payton as requiring a showing of probable cause was an error.

281 F. App'x 106, 109 n.3 (3d Cir. 2008).

Notwithstanding whether probable cause or a less stringent standard of reasonable belief applies here, it is clear that the Government, through the testimony of its witnesses and exhibits, has satisfied the more demanding probable cause standard to justify entry into 43 Schappet Terrace.  In determining whether probable cause for police action exists, a court must apply a "'common sense approach' and consider 'the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality.'"  Veal, 453 F.3d at 168-69 (quoting United States v. Magluta, 44 F.3d 1530, 1535-36 (11th Cir. 1995)).  Using this common sense approach, the local police and Task Force agents had probable cause to believe that Defendant

lived, or resided,[13] at 43 Schappet Terrace and was inside the residence before his arrest on June 4, 2013.

The totality of the circumstances known to law enforcement supports this conclusion. First, Philadelphia police officers linked Defendant and the silver Pontiac Bonneville to the Purple Orchid shooting, and learned that he drove this car which was registered to his girlfriend, Evonne Hodges. Next, Darby Borough police officers executed a search warrant for 30 Branford Road, an address where Defendant and Hodges were believed to reside, and the address that was on the Pontiac's state registration. During the search of 30 Branford Road, Hodges was present and admitted to knowing Defendant. She said that the silver Pontiac Bonneville was hers and that Defendant was in possession of this car. Hodge's admission was bolstered by the fact that police found Defendant's wallet and mail at the 30 Branford Road residence and the fact that the vehicle was not at the residence during the search. Furthermore, the confidential informant, with whom Detective Smith had personal contact, informed him that Defendant's only mode of transportation was the silver Pontiac Bonneville. Based on this information, it was reasonable to believe that wherever the silver Pontiac was located, Defendant could be found.

Second, through the same confidential informant, police had specific information linking Defendant to 43 Schappet Terrace. Detective Smith had met with the informant in person three times and spoke on the phone three to four times. In addition, Lieutenant Gibney also met with

---

[13] While the terminology used in Payton calls for reason to believe that the suspect *lived* at the residence, the Third Circuit, for purposes of this prong of the Payton test seems to use the term "live" and "reside" interchangeably. See, e.g., Veal, 453 F. 3d at 168 ("The following facts . . . gave the police officers probable cause to believe Veal *resided* at 1848 Conestoga Street . . . ." (emphasis added)); Agnew, 407 F.3d at 196 ("If Agnew *resided* at 2740 Ludwig Street, his arrest was lawful under Payton because the police acted pursuant to an arrest warrant. If Agnew did not reside at 2740 Ludwig Street, he may have lacked a privacy interest in the residence and would have no standing to challenge the police officers' entry." (citations omitted) (emphasis added)).

16

the informant.  See Gay, 240 F.3d at 1227 (finding that police officers could reasonably rely on information about a suspect's residence from face-to-face conversations with a confidential informant rather than just receiving information from an anonymous tip).  Thus, the confidential informant was not an unknown tipster, but someone whose information was to some extent corroborated by the authorities.[14]  Using the informant's tip, Philadelphia police sent out the "BOLO" ("be on the lookout") to Darby Borough police and other units for the Pontiac Bonneville at the Schappet Terrace address.

On June 4, 2013, all the crucial pieces of information merged when Officer Hudson, aware of the "BOLO," noticed that the silver Pontiac Bonneville registered to Hodges was parked on Schappet Terrace.  In addition to Hudson, Officer McGowan, Lieutenant Gibney, and Detective Brian Pitts observed the vehicle parked directly in front of 43 Schappet Terrace. Evidence of a vehicle connected with a suspect parked near the location where the suspect is believed to reside is a relevant factor in a determination of probable cause.  See, e.g., Veal, 453 F.3d at 168 (finding that the car suspect was reported to drive, registered to suspect's wife, was parked nearby at time of suspect's arrest was a factor in probable cause determination); Magluta, 44 F.3d at 1538 ("The presence of a vehicle connected to a suspect is sufficient to create an inference that the suspect is home.").

Finally, Detective Pitts' observation of a person in the second floor front bedroom window when the police knocked and announced their presence solidified the belief that Defendant was inside the residence.  Even though Defendant was not identified as the person seen by Detective Pitts, the strong inference is that it was him.  Thus, when Detective Pitts

---

[14] Detective Smith knew that Hodges had provided information that Defendant was using her car and this information corroborated the confidential informant on this point.

observed the person in a more private area of a residence, it further corroborated the confidential informant's information about Defendant's relationship to 43 Schappet Terrace.

The fact that the person on the second floor did not open the front door when the authorities knocked and announced their presence is evidence that the person inside did not want to be found by the police.  This fact provided further support for the belief that the person in the bedroom was Defendant, a sought-after fugitive since the Purple Orchid shooting.  See Veal, 453 F.3d at 168 (holding that the fact officers were aware defendant was a fugitive who might be attempting to conceal his location was a factor in probable cause determination); Magluta, 44 F.3d at 1535-36 ("[L]ack of response to the officer's knock and announcement did not indicate that no one was at home 'since it was reasonable to expect a fugitive to hide or flee if possible.'")  Thus, given the totality of the circumstances, there was probable cause to believe that Defendant was inside 43 Schappet Terrace and had a significant relationship to the residence. Consequently, armed with arrest warrants for Defendant, law enforcement's entry into the residence was lawful, and the items seized therein may be used by the Government at trial.[15]

---

[15] The Government advances an alternative argument in its Responses to the Motion to Suppress Physical Evidence and Observations.  (Doc. No. 25 at 9 n.1; Doc. No. 56 at 2-5.)  The Government contends that the "observations" of the Violent Crimes Task Force agents following their entry into the residence at 43 Schappet Terrace are admissible even if the entry was unlawful, citing United States v. Waupekenay, 973 F.3d 1533, 1537 (10th Cir. 1992); United States v. Bailey, 691 F.2d 1009 (11th Cir. 1982); United States v. Sprinkle, 106 F.3d 613, 619 (4th Cir. 1997); United States v. Dawdy, 46 F.3d 1427, 1430-31 (8th Cir. 1995); United States v. Garcia, 516 F.2d 318, 319-20 (9th Cir. 1975); and United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir. 1971).

These cases stand for the proposition that subsequent illegal conduct by a defendant is not excludable merely because there was an illegal search or arrest.  Although the Third Circuit has not yet ruled in a similar case, one judge of this Court adopted this reasoning in United States v. Johnson, citing the cases listed above:

Even if there was a prior illegal seizure, evidence [from the search] will not be suppressed because the crimes [defendant] committed while fleeing from police

**B.     Defendant's Statement to the Police on June 5, 2013 Is Admissible at Trial Because Federal Rule of Criminal Procedure 5 Was Not Violated**

Defendant next argues that his statement taken by two Philadelphia police officers after his arrest should be suppressed because it was taken in violation of Federal Rule of Criminal Procedure 5.  Rule 5 provides:

> A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c)[16] provides, unless a statute provides otherwise.

---

constituted independent grounds for a second, legitimate arrest.  Though the Third Circuit has not directly rule on this issue, the Government indicates that the First, Fourth, Fifth, Ninth, Tenth, and Eleventh Circuits have addressed it.

No. 08-297, 2009 WL 1578040, at *4 n.2 (E.D. Pa. June 4, 2009).

Because the Court has found the entry into 43 Schappet Terrace was lawful, the physical evidence seized and the observations made by the entrants were admissible at trial.  Thus, there was no need to decide the applicability of these cases to the instant one.

[16] Rule 5(c) provides:

 (1) If the defendant is arrested in the district where the offense was allegedly committed:

   (A) the initial appearance must be in that district; and
   (B) if a magistrate judge is not reasonably available, the initial appearance may be before a state or local judicial officer.

 (2) If the defendant was arrested in a district other than where the offense was allegedly committed, the initial appearance must be:

   (A) in the district of arrest; or
   (B) in an adjacent district if:
      (i)  the appearance can occur more promptly there; or
      (ii) the offense was allegedly committed there and the initial appearance will occur on the day of the arrest.

Defendant does not contend that Rule 5(c) by itself has been violated in this case.

Fed. R. Crim. P. 5(a)(1)(A).  The Defendant bears the burden of proving a violation of Rule 5. Little v. United States, 417 F.2d 912, 914 (9th Cir. 1969).  In the instant case, Rule 5 has not been violated for the following reasons.

As discussed above, Defendant was arrested after 11:30 a.m. on June 4, 2013 through the efforts of the Violent Crimes Task Force and the Darby and Lansdowne Borough police on the arrest warrants stemming from the search at 30 Branford Road and the Purple Orchid shooting. Lieutenant Gibney participated in the arrest and Defendant was turned over to the Darby Borough police on the warrants.  At that time, there was no federal prosecution.  Defendant was in the state custody charged with state crimes.

Defendant was brought before Magistrate Judge Tengalia in Darby Borough at noon on June 5, 2013.  In the interim, Philadelphia police traveled to the Darby Borough Police Station on June 4, 2013, and took a statement from Defendant from 5:30 p.m. to 7:50 p.m., in which Defendant provided information about the Purple Orchid shooting, the search at 30 Branford Road, and the incident earlier that day at 43 Schappet Terrace.

Defendant argues that the nearly twenty-four delay in bringing him before a magistrate was unnecessary and violated Rule 5 of the Federal Rules of Criminal Procedure because the record shows that Darby Borough had an on-call state magistrate judge that was available twenty-four hours a day, and that the magistrate's courtroom is located approximately fifty feet from the Darby Borough Police Station where he was taken after his arrest.

Defendant correctly notes that under the Supreme Court's McNabb-Mallory rule, the remedy for a violation of Rule 5 is suppression of any confessions made during a period of unreasonable delay.  Corley v. United States, 556 U.S. 303 (2009) (citing McNabb v. United States, 318 U.S. 332 (1943) and Mallory v. United States, 354 U.S. 449 (1957)).  Additionally,

Defendant is correct that delay for the sole purpose of interrogation is "unreasonable" under Rule 5.  Corley, 556 U.S. at 308 (quoting Mallory, 354 U.S. at 455-56) ("[D]elay for the purpose of interrogation is the epitome of unnecessary delay."); see also United States v. Thompson, 772 F.3d 752, 760-61 (3d Cir. 2014) ("The reasonableness standard under the McNabb-Mallory rule focuses primarily on whether the delay was for the purpose of interrogation.").

Defendant's reliance on Rule 5 and the McNabb-Mallory rule is misplaced, however, because Defendant was taken into state custody on state arrest warrants, rendering Rule 5, a federal procedural rule, inapplicable.  In United States v. Buck, the Tenth Circuit Court of Appeals held that "Rule 5(a) of the Federal Rules of Criminal Procedure applies only to arrests made by or for a federal official for a violation of a federal law.  It has no application to arrests made under state law for state offenses." 449 F.2d 262, 270 (10th Cir. 1971) (footnote omitted). This holding is also the law in other Circuits.  See also Little, 417 F.2d at 914 ("[Rule 5] regulates the conduct of federal officers, not state officers."); Peters v. Rutledge, 397 F.2d 731, 735 (5th Cir. 1968) ("[T]he federal rule requiring an arrested person to be taken without unnecessary delay before a committing magistrate has no application to one arrested on a state charge and in the custody of state officers." (internal quotation marks omitted)); Barnett v. United States, 384 F.2d 848, 856 (5th Cir. 1967) ("The 'McNabb Rule,' requiring exclusion of statements obtained during a period of detention in violation of [Rule 5(a)], has no application to failure to take the accused before a state magistrate.").[17]  Furthermore, a confession or statement obtained from a defendant while in state custody can be used in a federal trial for a federal

---

[17] In contrast to the custodial interrogation by state and local law enforcement, the applicability of Rule 5(a) to federal law enforcement entities "begin[s] after state authorities surrender custody and at the time federal officials effect their arrest on the federal charges."  Barnett, 384 F.2d at 857.

offense.  Kulyk v. United States, 414 F.2d 139, 142 (5th Cir. 1969); see also United States v.

Singleton, 361 F. Supp. 346, 352 (E.D. Pa. 1973).

Despite the applicable law, Defendant argues that courts recognize an exception to the

general rule, and apply both Rule 5 and the McNabb-Mallory suppression requirement to a

confession given while a defendant is in state custody where there exists a "working arrangement

between state police and federal agents for the purpose of aiding and abetting the federal officers

in carrying on an interrogation of the suspect."  United States v. Davis, 459 F.2d 167, 170 (6th

Cir. 1972); see also Barnett, 384 F.2d at 858 (describing a working arrangement to exist where

"cooperation amounts to collaboration to achieve an unlawful end" (internal quotation marks

omitted)).

Defendant argues that such a "working arrangement" existed here because the FBI

Violent Crimes Task Force participated in locating and apprehending Defendant.  Thus, he

argues that state and federal law enforcement worked closely on the Defendant's arrest so as to

trigger the requirements of Rule 5.  Defendant supports his argument by highlighting that

Detective Smith, a sworn federal officer, was the "lead case agent" as of May 25, 2013, who

served as the primary point of contact with the confidential informant; that local police officers

waited until federal agents arrived to execute the arrest warrant at 43 Schappet Terrace; that

federal agents Smith and Tarasca led the charge up the stairs in order to apprehend Defendant;

and that federal agents placed Defendant in handcuffs.  (Def. Ex. 3; Doc. No. 45 at 89.)

Defendant also claims that Philadelphia police officers assisted in the federal investigation and

prosecution by taking a statement from Defendant in which he discussed the events at 43

Schappet Terrace on June 4, 2013.

Defendant's arguments are unpersuasive because federal involvement through the Violent Crimes Task Force was limited to locating Defendant and assisting local authorities in execution of the state arrest warrants.  After his arrest, Defendant was taken into custody by local police on state charges and interrogated by Philadelphia police officers, not federal agents.  There is no factual basis in the record that federal agents even knew that Philadelphia police would be interrogating Defendant or that the officers knew that there would be a federal prosecution.  Thus, no evidence of a "working arrangement" exists to support the notion that the Philadelphia police detectives interrogated Defendant in order to "aid or abet" federal law enforcement.  See Kulyk, 414 F.2d at 142 (finding no "working arrangement" existed even when an FBI agent interrogated defendant in state custody because there was no evidence that the state continued to hold defendant in order to allow the FBI to secure a confession).

In fact, after Defendant's arrest was made, "lead case agent" Smith returned to work at the federal building in Philadelphia, and had no further contact with Defendant, who was taken into federal custody well after the events of June 4, 2013.  Accordingly, because at the time the statement was taken the Defendant was in state custody on a state arrest warrant for state charges, and there was no "working relationship" with federal authorities when Philadelphia police officers took the statement, Rule 5 does not apply and was not violated.[18]

---

[18] This reasoning mirrors the Tenth Circuit's reasoning in Buck, in which the court held:

> Indeed, the record . . . shows that [defendant] was being held in custody on a state charge at the time the confession was given; that he was not then being held by the state officials for the federal government, and that there was no unreasonable delay in taking [defendant] before a United States Commissioner after he was arrested on a federal warrant issued by such Commissioner [magistrate].

449 F.2d 262, 270 (10th Cir. 1971).

Finally, there is another reason why the statement given to Philadelphia police should not be suppressed.  The traditional <u>McNabb/Mallory</u> suppression rule has been modified by 18 U.S.C. § 3501(c).  <u>Corley</u>, 556 U.S. at 306 (holding that by enacting 18 U.S.C. § 3501(c), "Congress meant to limit, not eliminate, <u>McNabb-Mallory</u>").  In essence, the statute creates "a safe harbor period for certain voluntary confessions" that were taken within six hours of arrest.  <u>Thompson</u>, 772 F.3d at 760.[19]  Section 3051(c) provides, in relevant part, as follows:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided*, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. §3501(c) (emphasis original).

<u>Corley</u> summarized the court's two-step analysis in applying the statute.  First,

> If the confession came [within the six-hour] period, it is admissible, subject to the other Rules of Evidence, so long as it was 'made voluntarily and . . . the weight to be given [it] is left to the jury.'

556 U.S. at 322 (citing 18 U.S.C. § 3501(c)).  However, if the confession occurred after six hours,

---

[19] As long as the statement or confession is voluntarily given within six hours of the arrest, the remaining time of detention before the accused is arraigned is irrelevant: "[T]he relevant period of delay is measured from the time of arrest to the giving of the statement, and a period of illegal detention following the statement will not nullify a prompt acknowledgement by an accused of his guilt . . . ." <u>United States v. Davis</u>, 459 F. 2d 167, 169-70 (1972).

> The court must decide whether delaying that long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the confession is to be suppressed.

Id.; see also Thompson, 772 F.3d at 761.

Here, the record shows that Defendant was arrested after 11:30 a.m. and began giving his statement to the Philadelphia police officers at the Darby Borough Police Station at 5:20 p.m., a period that falls just shy of, but still within, the six-hour safe harbor period under § 3501. Moreover, Defendant has not contested the voluntariness of his statement. Because the statement was both timely and voluntary, the Court need not address whether there was unreasonable or unnecessary delay. Accordingly, Defendant's statement is admissible at trial.[20]

### C.    The Identity of the Confidential Informant Will Not Be Disclosed to Defendant

Next, Defendant argues that the Government must disclose the identity of its confidential informant who provided information to law enforcement regarding Defendant's presence at 43 Schappet Terrace. Defendant requests disclosure of the identity of the confidential informant because the informant may have information that will contradict Detective Smith or otherwise diminish his credibility as the Government's chief witness against him at trial. For reasons that follow, this argument is unpersuasive and the Government is not required to disclose the identity of the confidential informant.

The Government possesses a limited privilege to withhold the identity of a material witness or confidential informant in order to promote "effective law enforcement" by

---

[20] As noted above, this Opinion is being issued after the trial took place. At trial, the Government did not use the statement taken by Philadelphia police officers, which renders the argument about Rule 5 moot. Because the matter was a contested issue before trial, and already ruled upon by the Court, the basis for the ruling is included in this Opinion.

encouraging citizens, through assurances of anonymity, to communicate knowledge of crimes to law enforcement.  Roviaro v. United States, 353 U.S. 53, 59 (1957).

One fundamental limitation to the privilege is fairness, meaning that "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of the accused, or is essential to a fair determination of a case, the privilege must give way."  Id. at 60-61.  The defendant who seeks disclosure ultimately bears the burden of showing that fairness outweighs the government's privilege.  United States v. Jiles, 658 F.2d 194, 197 (3d Cir. 1981), cert. denied, 455 U.S. 923 (1982).  The defendant must make this showing based on more than "mere speculation" of the usefulness of the informant's testimony.  United States v. Stanton, 566 F. App'x 166, 168 (3d Cir. 2014), cert. denied, 135 S. Ct. 690 (2014).

In determining fairness, "there is no fixed rule"—rather, the Court must "balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense."  Roviaro, 353 U.S. at 62.  Relevant factors to balance include consideration of "the crime charged, the possible defense, the possible significance of the informer's testimony, and other relevant factors."  Id.

Based on these factors, the Third Circuit in Jiles established a four-part test to apply in determining whether disclosure of an informant's identity is warranted under Roviaro.  658 F.2d at 198-99.  Under this test, the informant's identity should be disclosed where: "(1) the possible testimony was highly relevant; (2) it might have disclosed an entrapment; (3) it might have

thrown doubt upon the defendant's identity; and (4) the informer was the sole participant other

than the accused, in the transaction charged." Id.[21] The court further noted:

> When applying this test, one of three types of cases may emerge. First, the court may be presented with an extreme situation, such as that in Roviaro itself, in which the informant played an active and crucial role in the events underlying the defendant's potential liability. In these cases, disclosure and production of the informant will in all likelihood be required to ensure a fair trial. At the other end of the spectrum, are the cases in which the informant was not an active participant or an eyewitness, but rather a mere tipster. In such cases, courts have generally held that the informant's identity need not be disclosed. A third group of cases falls between these two extremes and it is in this group that the balancing becomes most difficult.

Id. at 196-97 (citations omitted).

Here, the confidential informant gave information that was essentially limited to

connecting Defendant to the silver Pontiac Bonneville and 43 Schappet Terrace. This

information does not conceivably establish entrapment, throw doubt upon Defendant's identity,

or show that the informer was the only other participant in the transaction charged. Because of

the confidential informant's limited involvement in only providing information on the

---

[21] The Fifth Circuit Court of Appeals has established a three-part test. In United States v. De Los Santos, the court held:

> First, we evaluate the level of the informant's involvement in the alleged criminal activity. The more active the participation, the more likely disclosure will be required. On the other hand, if the informant's participation is minimal, it favors nondisclosure. Finally, if the evidence shows that an informer is a mere tipster, no disclosure of his identity is required. The second factor considers the helpfulness of disclosure to any asserted defense. The defendant is required to make a sufficient showing that the testimony would significantly aid the defendant in establishing an asserted defense. Mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure. The third consideration is the government's interest in nondisclosure. The government's interest relates to both the safety of the informant and the informant's future usefulness to the authorities as a continuing confidential source.

810 F.2d 1326, 1331 (5th Cir. 1987) (citations and internal quotation marks omitted).

whereabouts of Defendant, the only Jiles factor applicable here is whether the informant's possible testimony is highly relevant.

In making this latter determination, the holding of the Third Circuit in United States v. Bazzano is instructive. As the court noted at length:

> [Defendant's] argument, as to why the identity of the informant here would be useful, is vague. Mere speculation as to the usefulness of the informant's testimony is insufficient to justify disclosure of his identity. So far as appears, the informant's role in this case was nothing more than that of allegedly providing police with probable cause for conducting their search, and we have already held . . . that the fruits of the search are not subject to suppression even if the search warrant was defective. The evidence of [defendant's] guilt consisted primarily of the physical evidence seized during the search. Where an informant's role was in validating a search, disclosure of his identity is not required. [Defendant] has failed to present a convincing argument that the informant played any more important role in the Government's case or his defense.

712 F.2d 826, 839 (3d Cir. 1983) (citations and internal quotation marks omitted). See also McCray v. Illinois, 386 U.S. 300, 305 (1967) (holding that the identity of an informant need not be disclosed where the informant provides information relevant only to the question of probable cause for an arrest or search, and not the issue of a defendant's guilt or innocence); United States v. Martinez, 979 F.2d 1424, 1426 (10th Cir. 1992) ("Where the value of the informer's testimony remains speculative at best, we cannot say the district court erred by denying disclosure of the informer's identity." (internal quotation marks omitted)); United States v. De Los Santos, 810 F.2d 1326, 1331-32 (5th Cir.1987) (holding that "if the informant's participation is minimal, it favors nondisclosure" and "[m]ere supposition about the possible relevancy of the informant's identity is insufficient to warrant disclosure").

Balancing all of the above factors, disclosure in this case is inappropriate because the confidential informant (1) was a mere tipster who provided information relevant only to probable

cause, and (2) the usefulness of the informant's possible testimony as to Detective Smith's credibility is speculative and not highly relevant. The reasons for this conclusion follow.

First, the confidential informant in this case is a mere tipster, a fact that weighs against disclosure in this case. The informant was not an active participant or the sole eyewitness to the alleged crime. The informant merely provided information about Defendant's potential whereabouts, and was paid for the information as a one-time informant. Under Jiles, the "mere tipster" is generally granted protection from disclosure because of the policy interest in promoting useful information being given to law enforcement. Jiles, 658 F.2d at 196. The informant only gave information on the probable cause determination to enter 43 Schappet Terrace, not on Defendant's guilt or innocence. See Bazzano, 712 F.2d at 839. No case has been cited by Defendant where a "mere tipster" who provides information relevant to a defendant's whereabouts that supports only a probable cause determination has resulted in the disclosure of the informant's identity.

Second, the relevancy of any possible testimony from the informant is speculative at best. As discussed above, the defendant must provide reasons for disclosure that are beyond mere speculation or conjecture. Despite Defendant's claims that the possible testimony of the confidential informant may affect Detective Smith's credibility, the record reveals that the informant's possible testimony is not highly relevant to Smith's credibility, and that Defendant has means of attacking Smith's credibility without the Court requiring the disclosure of the informant's identity.

Defendant argues that Smith's credibility is crucial to the defense for two reasons. Initially, Defendant claims that Smith's testimony alone links the Defendant—through the information provided by the informant—to the residence at 43 Schappet Terrace, yet there is not

29

a single police report to verify this information.  Defendant is incorrect in making this argument.  After Officer Hudson observed the silver Pontiac Bonneville at 43 Schappet Terrace, he connected it to the shooting at the Purple Orchid.  He notified other Darby Borough police officers who arrived on the scene and also observed the automobile.  Lansdowne police officers also made the same observation.  Given what law enforcement knew at that point, with the car parked in front of 43 Schappet Terrace, Defendant's connection to the residence is evident.

Next, Defendant argues that, based on the testimony elicited at the suppression hearings, Detective Smith is the crucial government eyewitness in this case because he is the only witness to the alleged possessing and pointing of a gun by Defendant.[22]  He testified at the suppression hearing that he observed Defendant point the firearm at him while on the staircase and pull the trigger.  Despite the importance of Smith's testimony that Defendant pointed and attempted to shoot the gun, he was not the only witness to this incident.  Lieutenant Gibney also heard the sound of a gun racking while he was located on the stairs, and observed Defendant in the room.  Further, no other person was present in the house or bedroom at the time of the alleged attempt to shoot Detective Smith.  Defendant was the only person who could have racked the gun and pulled the trigger.

In addition, Defendant argues that the informant could possess valuable impeachment evidence based on factual discrepancies and other matters elicited at the hearings held on November 18 and December 15, 2014.  These issues will be discussed seriatim.

---

[22] Defendant is charged in Count One with assaulting a law enforcement officer.  He is charged in Count Three with possessing a firearm in furtherance of a crime of violence.  The crime of violence is the assault on the federal officer.

        1.        **Government's Memoranda of Law and Detective Smith's suppression hearing testimony**

Defendant highlights a factual difference between information Detective Smith allegedly provided counsel for the Government regarding the confidential informant, and what Detective Smith testified to at the suppression hearing.  The inconsistency is sourced from a brief and a reply brief filed by the Government, in which the prosecutor alleged that Smith told him that the confidential informant was a relative of Hodges, and had dropped off Defendant at 43 Schappet Terrace.  (Doc. No. 31 at 23-24; Doc. No. 25 at 5; Doc. No. 36 at 6.)  At the suppression hearing, Detective Smith said that he did not have any information that the informant drove Defendant to 43 Schappet Terrace, and that he did not have any information from the informant as to how he or she knew Defendant frequented 43 Schappet Terrace.  (Doc. No. 51 at 169.)

The contradictory statement in the Government's brief is made by the prosecutor, not the informant.  The prosecutor did not interview the confidential informant.  It is mere speculation at this point that the informant would contradict Detective Smith.  Mere speculation is an insufficient reason to require disclosure under Third Circuit precedent.[23]  Bazzano, 712 F.2d at 839; Stanton, 566 F. App'x at 168.  Moreover, the Government's memoranda and Smith's testimony are consistent on the fact that the informant said Defendant frequented Schappet Terrace.  (See Doc. No. 25 at 5; Doc. No. 36 at 6; Doc. No. 51 at 138-39; Doc. No. 56 at 7.)

On the contradictory point as to whether the informant dropped off Defendant at that premise, however the evidence is viewed, it is not highly relevant so as to require the disclosure of the witness's identity.  If the informant states that he or she did not drop off Defendant at 43 Schappet Terrace, then the statement would corroborate Smith's testimony.  Even if the informant testified to the contrary, his or her information would be corroborated by the fact that

---

[23] The defense was permitted at trial to cross-examine Detective Smith on any discrepancy that appeared in Government memoranda which differs from his testimony.

Defendant was found at that location.  It would contribute to the case against Defendant while only minimally affecting the credibility of Detective Smith given all of the evidence in this case. Moreover, the case against Defendant here was based upon events and seizures made after the authorities entered 43 Schappet Terrace.  The informant played no role in what took place at the premises on June 4, 2013.

> ## 2.    Law enforcement testimony regarding the timing of the informant's information and the "BOLO" advisory

Defendant argues that the timing of the information provided by the confidential informant, as Detective Smith describes it, raises questions.  Detective Smith testified at the suppression hearing that the confidential informant had told him that Defendant frequented 43 Schappet Terrace "days" before Defendant's arrest on June 4, 2013.  (Doc. No. 51 at 138, 165.) He further testified that he provided Gibney with this information "days" before Defendant's arrest on June 4, 2013 and that Gibney put out the "BOLO" advising all Delaware County police departments that Defendant frequented 43 Schappet Terrace.  (Doc. No. 51 at 164-66.)

Gibney's testimony in part contradicts Smith's testimony.  Gibney was never asked and therefore never testified to personally sending out the "BOLO."  (See Doc. No. 45 at 84; Doc. No. 51 at 10.)  Rather, he testified that he had no information linking Defendant to 43 Schappet Terrace until he spoke with Detective Smith on June 4, 2013 either on the way to that location or when they were on location waiting to enter 43 Schappet Terrace.  (Doc. No. 51 at 10.) Likewise, Darby and Lansdowne officers testified that they were notified to be on the lookout for a car Defendant may be driving.  The officers did not testify to knowing of a connection with the Defendant to 43 Schappet Terrace.  (Doc. No. 45 at 40, 46, 61, 64, 80-81, 84.)

Because the testimony of the officers themselves are the root of the discrepancy, Defendant does not need the testimony of the confidential informant to attack the credibility of

Detective Smith on this point.  Rather, Defendant was permitted to bring out the contradictory statements through the testimony of Gibney and the other officers.

### 3.    Nondisclosure of information about the confidential informant

Defendant argues that Detective Smith left out the information obtained from the confidential informant linking Defendant to 43 Schappet Terrace at two crucial moments of the investigation.  First, after Defendant's arrest, Smith was interviewed by the FBI.  In his statement to the FBI, Smith noted that he received information from Gibney that the silver Pontiac Bonneville was parked outside of 43 Schappet Terrace and "acting off this information" they entered the residence.  (Def. Ex. 4.)  In this statement, Smith does not mention having information from a confidential source that Defendant frequented 43 Schappet Terrace.  (Id.)

Defendant also argues that Detective Smith left out information about the confidential informant when interviewed by Sargeant McCaughn for purposes of obtaining the warrant to search 43 Schappet Terrace.  McCaughn interviewed Smith immediately after Defendant's arrest for the purpose of preparing a search warrant for 43 Schappet Terrace.  (Doc. No. 51 at 120-23.) During this interview, Smith did not mention anything about a confidential informant.  The resulting search warrant reflected this omission, as information from the confidential informant is not mentioned.

Again, Defendant was permitted at trial to elicit the fact that Detective Smith omitted information about the confidential informant in these two documents to impeach Smith's credibility.  Any possible testimony from the confidential informant would be irrelevant on these two points.  Both the FBI statement and the affidavit of probable cause were taken after the police entered 43 Schappet Terrace.  The FBI statement was merely a recitation of the events that occurred once inside 43 Schappet Terrace—its focus had nothing to do with the specific

circumstances surrounding why entry was made into the residence. Thus, Smith's omission of the information from the informant was irrelevant to the purpose for giving this statement.

Similarly, Lansdowne Borough police drafted the affidavit of probable cause after entry into 43 Schappet Terrace and Defendant's arrest. The information provided by the confidential informant is irrelevant to this affidavit because Lansdowne police were applying for a search warrant based on what transpired at 43 Schappet Terrace and what they saw in plain view after Defendant was taken into custody. Information regarding the reason why police entered 43 Schappet Terrace in the first place is irrelevant to this subsequent probable cause determination.[24]

Consequently, considering the balancing test mandated by Roviaro, the disclosure of the confidential informant's identity is not warranted. The informant is a mere tipster, providing information relevant only to probable cause to enter a premise, with no association to the offenses charged against Defendant. Moreover, Defendant has failed to provide any reason, beyond speculation, as to why the confidential informant's testimony would be highly relevant to challenge Detective Smith's credibility. Based on the current record, Defendant has ample contradictory statements to impeach Detective Smith which do not require the disclosure of the

---

[24] Defendant also argues that the discrepancy between what Detective Pitts testified to seeing in the front bedroom window and what Detective Smith testified that Detective Pitts said while observing the front bedroom window further discredits Detective Smith and supports his argument that the identity of the confidential informant must be revealed. The Court disagrees.

At the suppression hearing, Detective Pitts testified that he saw movement in the front bedroom window and that he could not tell the race or sex of the person. (Doc. No. 51 at 37-38.) Detective Smith testified that Detective Pitts exclaimed that there was a black male in the window. (Id. at 141.) This discrepancy has nothing to do with the confidential informant. It only bears upon the credibility of Detective Smith and Detective Pitts. As mentioned above, the credibility of Detective Smith can effectively be tested at trial by cross-examining the two detectives on the contradictory statements.

identity of the confidential informant.  At trial, the Court allowed Defendant to use any of the existing contradictory testimony he deemed appropriate.[25]

  In contrast to Defendant's arguments for disclosure are the interests behind upholding informer's privilege: (1) promoting the reporting of crimes to law enforcement and (2) protecting the safety of confidential informants.  Roviaro, 353 U.S. at 59; Jiles, 658 F. 2d at 198.  The safety of the confidential informant, especially when he or she is a mere tipster and not an active participant in the alleged crime, is an important factor that could weigh in favor of nondisclosure. "Where disclosure will jeopardize the personal safety of the informant, and the informant's prospective testimony is not exculpatory, courts should ordinarily not order disclosure."  United States v. Savage, No. 07-550-03, 2013 WL 398914, at *2 (E.D. Pa. Feb. 1, 2013) (citing United States v. Edelin, 128 F. Supp. 2d, 23, 33-34 (D.D.C. 2001)).  Nevertheless, the Court notes that risk of danger to the informant "cannot justify a deprivation of [defendant's] right to a fair trial." Jiles, 658 F.2d at 199.

  Here, the Government alleges that the safety of the confidential informant is at risk if his or her identity was disclosed.  (Doc. No. 36 at 16.)  Although Detective Smith testified that he is unaware of any threats made to the informant (Doc. No. 51 at 154), considering the fact that

---

[25] At the November 18, 2014 suppression hearing, defense counsel claimed that counsel for the Government in a phone conversation with him disclosed the identity of the informant as a specific relative of Evonne Hodges.  Based on this information, Defendant argues that the Government waived the privilege protecting the identity of the confidential informant. (Doc. No. 45 at 16-20.)  In support of this argument, Defendant cites Roviaro, which held that "once the identity of the informant has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable."  353 U.S. at 60.

Counsel for the Government denies that this disclosure was made.  The Government at the suppression hearings and in memoranda described the informant in more general terms as a relative of Hodges.  (Doc. No. 25 at 5, 13; Doc. No. 31 at 23; Doc. No. 36 at 6; Doc. No. 45 at 13.)  This disclosure was limited and did not waive the privilege.  Moreover, given the denial as to what was said in the phone conversation between counsel, there is no stipulated fact of record that the identity of the confidential informant was revealed.

Defendant is charged with serious violent crimes, the safety of the confidential informant is a valid consideration that weighs in favor of nondisclosure.

Defendant argues that in Jiles, the government provided a "sealed affidavit to the court set[ting] forth specific facts substantiating the Government's claim that disclosure of the informant's identity may result in danger to the informant." 658 F.2d at 198. In contrast, here, the Government relies upon the series of violent crimes with which Defendant is charged to justify the claim that the informant would be in serious jeopardy if his or her identity were disclosed. Jiles did not hold that such an affidavit is required in every case where the government does not want to disclose an informant's identity. In this case, Defendant has been linked to a shooting in Philadelphia at the Purple Orchid and to firearms at 30 Branford Road in Darby. At this location, a firearm was recovered and one was missing from a box. The missing firearm was located at 43 Schappet Terrace. The testimony from Detective Smith and Lieutenant Gibney is that Defendant was the only one present in the front bedroom, racked the firearm, and Detective Smith saw it pointed at him. Given the pattern of behavior, the Government's concern is justified and its interest in the safety of the informant has been established.[26]

Moreover, protecting the identity of the informant, who was not involved in the commission of the crime in this case, further promotes the government's interest in encouraging tipsters and concerned citizens to report crimes to law enforcement.

---

[26] The Court considered the possibility of performing an *in camera* hearing of the confidential informant's testimony at the November 18, 2014 suppression hearing. (Doc. No. 45 at 25-27, 35.) Upon further consideration, and based on the facts and analysis above, such *in camera* inspection was not deemed necessary by the Court. Moreover, Defendant has now been convicted of the violent crime of assault on a federal agent, which buttresses the Government's claim on the safety factors and the need to protect the informant by not disclosing his or her identity.

**IV.     CONCLUSION**

Based upon the foregoing reasons, the Court will deny Defendant's Motions to Suppress Physical Evidence and Observations and to Suppress his Statements (Doc. Nos. 24, 33) and Defendant's Motion and Supplemental Motion for Disclosure of the Identity of a Material Witness (Doc. No. 32.).